The CHIEF JUSTICE
 

 delivered the opinion of the court, and after stating the case went on thus:
 

 Before proceeding to consider the questions arising on the instructions regarded in connection with the evidence, a motion to dismiss the writ of error must be disposed of.
 

 It is objected to the writ of error that it was not allowed by any judge; but this is not required. It is enough that it was issued and served by copy lodged with the clerk of the court to which it was directed.
 

 It is objected to the citation that it was dated 16th April, which was before the date of the judgment; but it is clear, from the number which it bears, taken in connection with the judgment it describes, that it was issued after the rendition on the 6th of June. The date must have been a mere clerical error, and the service on the 14th of September was regular and sufficient.
 

 The fact that another writ of error and another citation, not served, were issued, cannot prejudice the writ and citation which were duly issued and served.
 

 It is also urged that the appeal bond was not approved by the judge. But it is a fair inference, from the acts of the
 
 *454
 
 judge, in signing the citation, and in witnessing the appeal bond, that be approved of the security. The Judiciary Act does not, in terms, require that the judge shall put his ap-. proval of the bond in writing, nor can a writ of error be treated as a nullity because sufficient security is not given. This court will take care, on application, that the rights of the defendant in error be not prejudiced by the omission, but will not dismiss the wi’it except on failure to comply with such terms as it may impose.
 
 *
 

 The motion to dismiss in this case must be denied.
 

 The first question upon the merits arises upon the fourth and fifth instructions.' The court had already charged in substance that a contract in consideration of aid to be given in putting in operation an illegal banking company in Tennessee was void. From the fifth instruction, taken in connection with those 'which preceded, and with the evidence, the jury must have understood that in the judgment of the court a contract in consideration of aid in promoting the objects and effecting the purposes of an illegal banking company, when once in operation, was valid.
 

 "We think this construction of the statute of Tennessee too nai'row. The intention of the act was declared by its title. It was an act to suppress private banking. Its object was the protection of the people against the evils of an unauthorized currency — than which hardly any object of legislation is more important. The currency measures all values, and is the medium, directly or indirectly, of all exchanges. To keep it sound, and to guard it as far as possible from fluctuation, are among the most imperative duties and among the most difficult problems of government.
 

 In the construction of this act it was the duty of the court below, as it is ours here, to give effect to its obvious intention, if that can be done without disregarding settled rules of interpretation.
 

 What, then, is the true sense of the prohibition to erect, establish, institute, or put in operation any banking com
 
 *455
 
 pany, or to issue any bills or notes with intent or purpose to do so ? "What is meant by putting in operation or establishing a banking company? We think that this language has a much wider import than mere commencement of business. To establish a company for any business means complete and permanent provision for carrying on that business, and putting a company in operation may well include its continued as well as its first dr original operation.
 

 This construction is supported by the prohibition to issue bills or notes. Taking the act of establishment and putting in operation, in the restricted sense of the instructions, the issue of circulation could not precede but must follow those acts. The prohibition of such issues, therefore, must be taken as proof that the legislature did not use the words in that sense. ’
 

 The emission and circulation of unauthorized notes and bills as money was the main object and business of the company, and it was precisely this object and business which the legislature intended to defeat and prohibit.
 

 We must construe the act, therefore, as covering with its penal prohibition the whole range of devices by which illegitimate currency is imposed on the community. It prohibits the use of such currency during the whole period of the establishment of an illegal company, and applied as com- • pletely to the last as to the first step of its operations. Any other construction would frustrate the legislative intent and leave the great mischief, which the statute was made to prevent, wholly without restraint or check.
 

 It was quite clear, upon the evidence, that McMahon entered into the transaction, which resulted in the bill sued on, in the expectation of profit from aiding the operation of the prohibited bankin'g company. He was engaged with its officers and stockholders in the scheme of imposing upon the community a prohibited and fraudulent currency. His name was upon its circulating bills, and his credit promoted their circulation. His curator cannot look to the law for remedies against his associates in this illegal undertaking.
 

 With this view of the statute and of the evidence we can
 
 *456
 
 not distinguish this ease from that of
 
 Brown
 
 v.
 
 Tarkington,
 

 *
 

 decided at the last term., In that case we held that notes given for a balance found due on a settlement of accounts with an illegal banking company, and for advances to redeem its circulation, could not be enforced in favor of a payee who had been participant in the illegal business. The bill in this case, in our j udgment, is of the same character.
 

 It was urged in argument that the contract we have been considering was made in Louisiana, and not invalid by the laws of that State. But this is not so. The bill of exchange was ma.de in Tennessee. It bears date at Memphis, and was signed there; and the contract of the defendant below was to be performed there. ¥e by no means say that it would be valid if made in Louisiana. It is not necessary to consider that question; the laws of Tennessee determine the question of its validity, and we think that according to those laws it was invalid.
 

 In our judgment, therefore, the fifth instruction was erroneous.
 

 The sixth and seventh instructions remain to be considered. The sixth announced, without qualification, the proposition that the holder of a bill of exchange, signed and indorsed in blank, has unlimited authority to fill it up at pleasure and'bind the signer and indorser by his act.
 

 This instruction cannot be sustained. . The delivery of a bill of exchange signed and indorsed in blank only authorizes the receiver, as between himself and the drawer and indorsor, to fill it up in conformity with the authority given him. If there has been no agreement, the authority is general; if there has, it must be pursued. The burden of proof that there was an agreement, and that its terms have been violated,*is, in such a case, upon the defendant; but if he can make the proof it will avail him. No person, unless authorized, either directly or by just inference from the nature of the transaction, can fill up a blank bill for his own benefit, nor can such a bill be enforced against the drawer
 
 *457
 
 and indorser in favor of any one who takes it in bad faith; that is, with knowledge that it has been filled up without authority or in fraud.
 
 *
 

 It is highly probable that the court below intended that its instructions should be taken with this limitation; but it was too general in its terms, and was, we think, calculated to mislead the jury.
 

 The seventh instruction directed the jury in substance to find for the plaintiff if satisfied that the bill was signed in blank and delivered to Kirby to be sent to McMahon. It asserted that McMahon had the right in the case supposed to fill up the bill with any amount due him and make the drawers and indorsers liable on the bill to himself.
 

 It is doubtless true that, subject to the limitations just stated, the delivery of a signature in blank is in general an authority to the holder to fill it up as he thinks proper. This rule, in its application to negotiable instruments, was very clearly stated by Mr. Justice Clifford in
 
 The Bank of Pittsburgh
 
 v.
 
 Neal,
 

 †
 

 as follows: “Where a party to a.negotiable instrument intrusts it to the custody of another, with blanks not filled up, -whether it be for the purpose to accommodate the person to whom it was intrusted; or to be used for his own benefit, such negotiable instrument carries on its face an implied authority to fill up the blanks and perfect the instrument; and as between such party and innocent third parties the person to whom it was so iutrusted must be deemed the agent of the party who committed such instrument to his custody — or in other words, it is the act of the principal, and he is bound by it.”
 

 But the instruction before us went much further. It asserted the right of a drawee to fill up a blank bill and hold the drawers and indorsers, and this without- any other authority than such as is implied in the fact that the bill was sent to him by the last indorser with the consent of the other indorser and of the drawers.
 

 
 *458
 
 Now it is quite clear that this fact implies no such authority. The only inference to be drawn from the circumstance that the bill was sent to McMahon in blank is that it was sent to him for acceptance. The structure of the paper excludes any other hypothesis. If, having received the bill in blank, ho had accepted it and negotiated it to a third person, without notice of facts impeaching its validity between the antecedent parties, those parties would have been bound to the holder. But he, as drawee, could not transfer the bill to anybody without previous acceptance, and still less could he treat it as an obligation to himself.
 

 "We think there-was error in these instructions as well as in the fifth.
 

 The judgment of the District Court must, therefore, be reversed and the cause remanded for new trial in
 

 Conformity with this opinion.
 

 ÍTote. — Another case, No. 52 of the Term, between the same parties, and where the questions were the same, was disposed of in the same way.
 

 The CHIEF JUSTICE
 

 delivered the opinion of the court.
 

 In this case, also, there is a motion to dismiss the writ of error; but, on looking into the record, we find that the writ was duly sued out and served, bond given, citation issued and served, and the record, with a copy of the citation and of the writ of error, brought up and filed in this court at the next term. There is no ground for the motion, and it is denied.
 

 Upon the merits the case is the same with that just decided. The suit below was upon three bills of exchange, each for $1000; but otherwise blank as to signatures and indorsements, which were the same as upon the bill in the other case. The bills were sent by Kirby to McMahon, and were by him filled up in precisely the same manner as the other bill.
 

 The charges of the court were substantially the same as in the other ease, and the judgment is reversed for the same errors, and the cause
 

 Remanded for a new trial.
 

 *
 

 Martin
 
 v.
 
 Hunter’s Lessee, 1 Wheaton, 361; Catlett
 
 v.
 
 Brodie, 3 Id. 553.
 

 *
 

 3 Wallace, 377.
 

 *
 

 3 Kent’s Com. 119; 10 Smedes & Marshall, 590.
 

 †
 

 22 Howard, 107.