**SUBURBAN TRUST COMPANY,**
**Plaintiff,**

v.

**NATIONAL BANK OF WESTFIELD,**
**Defendant.**

**Charles R. HOWELL, Commissioner Department of Banking and Insurance of the State of New Jersey, and Arthur J. Sills, Attorney General of the State of New Jersey, Plaintiff,**

v.

**NATIONAL BANK OF WESTFIELD,**
**Defendant.**

**Civ. Nos. 837–62, 875–62.**

United States District Court
D. New Jersey.

Oct. 3, 1963.

Riker, Danzig, Scherer & Brown, by William Riker, Newark, N. J., for plaintiff, Suburban Trust Co.

Arthur J. Sills, Atty. Gen. of N. J., by Alan B. Handler, Asst. Atty. Gen., for plaintiffs Howell and Sills.

Dughi & Johnstone, by Irvine B. Johnstone, Jr., Westfield, N. J., for defendant.

WORTENDYKE, District Judge.

These two actions will herein be referred to by their respective docket numbers. Each case rests upon the same factual foundation and involves similar ultimate questions of law. They have, therefore, been consolidated, and are considered together herein.

837–62 was instituted in this court, whose jurisdiction was invoked under the provisions of 28 U.S.C. § 1331(a). Docket 875–62 was initially instituted in the Law Division of the Superior Court of New Jersey, by the filing of a complaint in lieu of a prerogative writ, and was thereafter removed to this court by reason of the existence of original jurisdiction in this court under 28 U.S.C. § 1331 (a). At the time of that removal, there was pending but undetermined in the Superior Court of New Jersey a motion by the plaintiffs for ad interim relief which was heard by this Court following removal. That motion was denied by this Court's order of December 26, 1962.

Cross-motions for summary judgment by all parties (including defendant as counterclaimant) were duly noticed and argued in each of these cases, and by this opinion the Court disposes of all of said motions. All parties concede that there is no genuine issue as to any material fact and that the cross-motions are appropriately brought under F.R.Civ.P. 56.

The complaint in each of these actions was summarized in this Court's opinion filed December 10, 1962 and reported in 211 F.Supp. 694. It will appear therefrom that in 837–62 a New Jersey state bank, the Suburban Trust Company (hereafter "Suburban"), seeks to enjoin a national bank, the National Bank of Westfield (hereafter "National"), from continuing to operate a branch of the latter and a declaratory judgment that such an operation is improper and that its approval by the Comptroller of the Currency of the United States is invalid. By this Court's order of June 10, 1963, leave was granted to National to counterclaim against Suburban for injunctive relief against Suburban's operation of its branch at 905 Woodland Avenue, Mountainside, for a judgment declaring such operation illegal and for damages suffered by National by reason of such operation. In 875–62 the New Jersey Commissioner of Banking and Insurance

and the Attorney General of that State (hereinafter jointly referred to as "Commissioner") seek a declaratory judgment that the operation of the branch of National is illegal and without authority; and that the state bank Suburban alone is legally entitled to establish and operate a branch in the municipality in question. In the same action the plaintiffs seek injunctive relief against further operation by National of its branch therein.

The uncontradicted facts disclosed upon the cross-motions for summary judgment may be summarized as follows. Suburban is a banking institution duly chartered by the appropriate authority of the State of New Jersey, with its principal office in the Town of Westfield, Union County, New Jersey, and National is a federally-chartered bank with its principal office in the same municipality. The Borough of Mountainside is a municipality located in the same County and State, and each of the banking institutions involved in this litigation is at present operating a branch bank in that municipality. On May 26, 1960, National filed an application with the Comptroller of the Currency (hereinafter "Comptroller") to establish a branch office in the Borough of Mountainside and, within a month thereafter, entered into a contract for the purchase of two parcels of real estate in that Borough upon which it would erect the branch office for which it sought authorization. Title to the real estate was taken by National in July, 1960. By his certificate dated October 15, 1962, the Comptroller authorized National to establish and operate a branch in the Borough of Mountainside upon the property which National had acquired. On January 19, 1961, while National's application was pending before the Comptroller, Suburban filed with the Commissioner of Banking and Insurance of the State of New Jersey (hereafter "Commissioner") an application for permission to open a branch office in the Borough of Mountainside. Pending such approval, Suburban entered into a contract for the purchase of land in the Borough upon which to establish and operate such a branch. The Commissioner issued his approval to Suburban on October 3, 1961, but the zoning ordinance of the Borough was found by Suburban to prohibit the use of the land which it had contracted to purchase for its intended branch. Accordingly, Suburban applied to the appropriate municipal authority for a variance of the zoning restrictions to permit its desired use. Such variance was denied, and further relief from the restriction was thereupon sought by Suburban. During the period of time which elapsed in the course of Suburban's efforts to obtain relief from the zoning restrictions, the Commissioner extended, for successive six-month periods to October 3, 1963, his approval of Suburban's contemplated establishment of the branch. At all times, National had knowledge of that approval and of the extensions thereof. On October 16, 1962, pursuant to the certified approval of the Comptroller, National opened a branch bank in a temporary movable structure, on the land which it had purchased in the Borough for that purpose, and has been continuously, since that date, conducting its banking business at that location. After the institution of the present litigation, Suburban applied to the Commissioner for permission to change the location of its contemplated branch from the site which the Commissioner had approved, which still remained unavailable for such use under the existing zoning restrictions, to a different site in the same Borough. This request was granted by the Commissioner on April 2, 1963, following which, on May 23, 1963, Suburban opened a branch facility in a temporary structure on the new site, 905 Woodland Avenue, Mountainside, which is within 125 yards of the branch which National has been operating since October of 1962.

At all times relevant to the questions herein presented, N.J.R.S. (New Jersey

Revised Statutes, hereafter "R.S.") 17:-9A–20, N.J.S.A. provided as follows:

"Before any branch office shall be established, except those branches established pursuant to paragraph (1) of subsection B of section 19, the bank * * * shall file written application in the department for the commissioner's approval thereof. If, after such investigation or hearings, or both, as the commissioner may determine to be advisable, he shall find (1) that the bank * * has complied with the requirements of section 19, (2) that the interests of the public will be served to advantage by the establishment of such branch office, and (3) that conditions in the locality in which the proposed branch office is to be established afford reasonable promise of successful operation, the commissioner shall, within ninety days after the filing of the application, approve such application." [1]

Suburban invoked the provisions of the foregoing New Jersey statutory section in seeking the approval of the Commissioner of its applications to establish the branch office in Mountainside.

R.S. 17:9A–19, N.J.S.A., insofar as relevant to the questions presented upon the pending motions, provides as follows:

"A. Any bank * * * may * * * establish and maintain branch offices, subject to the conditions and limitations of this article [Article 6 of Title 17].

"B. No bank * * * shall establish or maintain a branch office which is located outside the municipality in which it maintains its principal office; except that a bank * * * may establish and maintain a branch office or offices anywhere in the same county as that in which it maintains its principal office * * * (3) when each proposed branch will be established in a municipality in which no banking institution has its principal office or a branch office."

N.J.R.S. 17:9A–1(2), N.J.S.A. defines "banking institution" as " * * * * a bank * * * and a national banking association having its principal office in this State"; "bank" is defined in R.S. 17:9A–1(1), N.J.S.A. as any bank chartered by the State of New Jersey.

At all times relevant to the questions presented upon the pending motions, 12 U.S.C. § 36 provided in part as follows:

"The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following: * * * (c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: * * * (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * * "

The right of Suburban to establish and operate a branch in Mountainside is clearly governed by the foregoing New Jersey statute. R.S. 17:9A–19, N.J.S.A. authorizes Suburban to open a branch anywhere in Union County, wherein its principal office is located, but only in municipalities therein where no bank, state or federal, has a branch, and only if the Commissioner grants his approval under R.S. 17:9A–20, N.J.S.A. Mountainside is in Union County, and the Commissioner has approved Suburban's application to open a branch there. The only question as to its right to open a

---

1. The provisions of paragraph (1) of subsection B of section 19 referred to in R.S. 17:9A–20, N.J.S.A., relate to a re- ceiving bank or a receiving savings bank, and are inapplicable to Suburban.

branch in that municipality is whether any state or national bank "has" a branch there within the meaning of the limitation imposed by R.S. 17:9A–19, subd. B (3), N.J.S.A.

The right of National to establish a branch in Mountainside is clearly governed by 12 U.S.C. § 36, quoted above. That statute permits National to establish a new branch, with the Comptroller's approval, at any point in New Jersey if the New Jersey statutes affirmatively authorize the establishment of new branches of its state banks, and subject to the restrictions of location imposed by New Jersey law on those banks. R.S. 17:9A–19, N.J.S.A., quoted above, affirmatively authorizes a state bank to establish branches anywhere in the county in which its principal office is located, and National is consequently empowered by 12 U.S.C. § 36(c) to establish new branches anywhere in Union County wherein its principal office is maintained. R.S. 17:9A–19, subd. B(3), N.J.S.A., quoted above, prohibits a state bank from establishing a branch in a municipality where another state or national bank has a branch. That limitation constitutes a "restriction as to location" within the meaning of 12 U.S.C. § 36(c) and is therefore incorporated in section 36(c) and made applicable to National. National has received the Comptroller's approval to establish a branch in the Borough of Mountainside in Union County, and the establishment of such a branch in that County would be authorized by New Jersey statute law to its state banks. The only question as to National's right to open the branch in Mountainside is whether any state or national bank "has" a branch in that municipality within the limitation imposed by R.S. 17:9A–19, subd. B(3), N.J.S.A., which is the location restriction incorporated in 12 U.S.C. § 36(c).

The basic issue in these cases then is the meaning of R.S. 17:9A–19, subd. B (3), N.J.S.A. which governs the rights of both Suburban and National to establish and operate a branch in Mountainside. Specifically, what is the meaning of the following words of that section of the statute: " * * * has * * * a branch office"? Does a bank "have" a branch immediately on obtaining the approval, as the case may be, of the Commissioner or the Comptroller; or does it "have" a branch only when it has begun actual business operation of the branch office?

No case has been cited by any of the parties which construes R.S. 17:9A–19, subd. B(3), N.J.S.A. Suburban and the Commissioner both argue that the Commissioner's approval, on October 3, 1961, of Suburban's application for a branch by itself amounted to the actual establishment of a branch office in Mountainside and that such establishment was continued by the Commissioner's successive extensions of the time within which the branch should have been opened. Therefore, both of said parties conclude that once the Commissioner issued the certificate of approval to Suburban, it "had" a branch in Mountainside within the meaning of R.S. 17:9A–19, subd. B(3), N.J.S.A.

Having in mind that the approval which Suburban obtained from the Commissioner on October 3, 1961 was for the establishment of its proposed branch in the Borough of Mountainside at 1210 U. S. Highway Route 22, and that such approval was "subject, of course, to the availability of the site for banking purposes as may be determined under applicable municipal ordinances", it seems fair to inquire when and where such conditional approval ripened into the establishment of a branch office in the Borough. The inquiry is even more emphatically justified when it is conceded not only that the site referred to in the initial approval was not available when the approval of the Commissioner was granted, but also that it continued to be unavailable for such purpose despite subsequent extensions of that approval, and that efforts to secure judicial removal of the obstacles to availability were finally abandoned by Suburban. If the approval by the Commissioner of Suburban's application for the establishment of a

branch at the original site designated in its application was never availed of, but a branch was opened by Suburban at a different site after National had commenced business pursuant to the Comptroller's authorization, how can the Commissioner's approval be equated with Suburban's establishment of a branch? The certificate of authority which Suburban obtained from the Commissioner related to a particular site and was conditioned upon Suburban's ability to overcome municipal regulations precluding the use of the site for that purpose. Suburban was unable to comply with those conditions and was forced ultimately to abandon that site. By the time Suburban secured approval for a different location, the Comptroller had unconditionally approved National's application to establish and operate a branch in that municipality. After National's branch commenced its operations, Suburban was still obtaining extensions of the Commissioner's approval for the original site, which it was ultimately forced to abandon. When Suburban obtained the Commissioner's initial approval, it did not "have" a branch office in Mountainside, and only the most violent distortion of the meaning of language could interpret the issuance of the Commissioner's conditional certificate as vesting Suburban with actual possession of a branch office there.

Strangely enough, Suburban, National and the Commissioner rely upon National Bank of Detroit v. Wayne Oakland Bank, 6 Cir. 1958, 252 F.2d 537, cert. den. 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958), to sustain their respective diametrically opposite contentions. Suburban and the Commissioner, however, overlook the fact that the respective positions of the banking institutions involved in that case were the reverse of those in the case at bar. In Wayne Oakland, the state bank "established a branch in Troy" when "no other bank had been established in that city", but after approval by the State Banking Commissioner. The national bank had applied for approval of the Comptroller of the Currency of the United States to establish a branch in the same city prior to the establishment of the state bank's branch. The state bank "sought a declaratory judgment that it would be unlawful for the National Bank of Detroit to open a branch bank in Troy, after The Wayne Oakland Bank had established its branch there; and * * * a restraining order to prevent the Comptroller from issuing a certificate of authority to the National Bank of Detroit, as well as an order restraining the latter from establishing and operating such a branch." The District Court was affirmed in holding that "since The Wayne Oakland Bank had already opened, and had in operation, a branch in Troy, the subsequent establishment in the same city of a branch of another bank, such as the National Bank of Detroit, * * was prohibited by Title 12 U.S.C.A. Section 36, and Section 23.762 of the Michigan Statutes Annotated, * *." The Michigan Act authorized a state bank to "establish and operate" a branch, within certain territorial limits, "Provided * * *, That no such branch shall be established in a city or village in which a state or national bank or branch thereof is then in operation." Said the Court of Appeals (at pp. 539–540 of 252 F.2d): "We are of the opinion that * * * the Michigan statute (17 M.S.A. Section 23.762) is here controlling; that the limitation therein contained as to branch banks *applies, not only to state banks, but to national banks as well;* and that Title 12 U.S.C.A. Section 36, not only did not empower the Comptroller to establish a branch of the National Bank of Detroit in Troy, Michigan, subsequent to the establishment in that city of a branch of The Wayne Oakland Bank, but, by clear implication, prohibited him from doing so." (Emphasis supplied.) In other words, the establishment of a branch of one bank, state or national, precludes the establishment of a branch of another, national or state, in the same municipality, and, (at p. 541 of 252 F.2d) "* * * to the contention that this discriminates

against national banks in those cities where a state bank is the first to establish a branch, it can equally be said that *the same discrimination operates against a state bank, when a national bank is the first to establish a branch.*" (Emphasis supplied.) The Wayne Oakland case refused to equate approval with establishment. The Court held (at p. 543 of 252 F.2d) that "[s]ince the only legal way in which the Commissioner's approval is evidenced is by his certificate, the branch of the National Bank of Detroit could not be said to be approved until the certificate was issued. * * * Since there was no approval by the Comptroller of the application by the National Bank of Detroit, for the branch bank, within the intendment of the statute, there cannot be said to be any 'establishment' of such branch within the statutory meaning of the term. * * * In any event, since no certificate had been issued, the matter is not important, in our view of the case." Elsewhere in the same opinion, (at p. 540 of 252 F.2d) the Court of Appeals construed 12 U.S.C. § 36 as meaning, " * * * that a national bank shall be permitted to establish an outside branch in a city if state law permits a state bank to *establish* and *operate* [emphasis supplied] an outside bank, *at the time* [emphasis in text], in the same city. If there were no other bank operating in Troy, the establishment of a state or national bank would, at that time, be permitted." If that case is to be used as a governing precedent for the cases at bar, it necessarily follows that the priority of National's commencement of business at its duly approved branch in the Borough of Mountainside precluded the establishment and operation of the Suburban branch in the same municipality. Commissioner State Bank of Roseville v. Gidney, D.C.D.C.1959, 174 F.Supp. 770, affd. D.C.Cir. 1960, 278 F.2d 871, also cited by Commissioner, does not sustain his contention that a branch bank office of Suburban was established, as a matter of law, by the Commissioner's certificate of approval therefor, rather than by the physical opening of such a facility.

Commissioner also seeks support for his contention that "approval" equals "establishment" of a branch bank in Michigan National Bank v. Gidney, 1956, 99 U.S.App.D.C. 134, 237 F.2d 762, cert. den. 1956, 352 U.S. 847, 77 S.Ct. 55, 1 L.Ed.2d 54. We discern no such support therein. First National Bank of Whippany v. Trust Company of Morris County, App. Div.1962, 76 N.J.Super. 1, 183 A.2d 706, also cited by the Commissioner, appears equally devoid of assistance to him in the case at bar. That case merely decided that the Commissioner was not required to hold a hearing of adversary type before *authorizing the establishment* of a branch banking office under R.S. 17:9A–20, N.J.S.A. Indeed, the obvious sense of the phrase "[b]efore any branch office shall be established" in the statutory section cited is consistent only with the contemplation of "establishment" of the branch *after* approval given by the Commissioner. The verb "establish" as statutorily employed has been frequently judicially construed in connection with the business of banking. "To establish a company for any business means complete and permanent provision for carrying on that business, and putting a company in operation may well include its continued as well as its first or original operation." Davidson v. Lanier, 1866, 4 Wall. 447, 71 U.S. 447, 455, 18 L.Ed. 377.

The plain meaning of the language of R.S. 17:9A–19, subd. B(3), N.J.S.A., when read in the context of the other relevant sections of Article 6 of Title 17 dealing with the power to branch and in the light of the basic purpose of that Article, requires the interpretation that a bank "has" a branch in a municipality, for the purpose of determining the right of another bank to open a branch there, only when it has a branch in operation and not when it merely has the approval of the appropriate governmental authority to open a branch.

The effect of all of paragraph B of R.S. 17:9A–19, N.J.S.A. is to prohibit a branch outside of the municipality in which the bank has its principal office,

with the exception that a bank may branch anywhere in the county where its principal office is located in three situations: (1) where there is a merger of two banks, and the proposed branch will be operated at the location of the acquired bank's branch or principal office; (2) where the proposed branch will be operated at the location of the branch or main office of a bank in liquidation; and (3) (the present case) in a municipality where no other bank "has" a main office or branch. Since the first two situations obviously involve cases where a branch office is in actual operation, it is reasonable to infer that the third situation also contemplates a case where a branch is in actual operation. The apparent purpose of all three exceptions is, in effect, to prevent new branches in municipalities which are already being served by an operating branch or principal office.

When paragraphs A and B. of R.S. 17:9A–19, N.J.S.A. speak of the power of state banks to open branches, they employ the adjectival phrase "to establish and maintain branch offices" to modify "power". Consequently, when paragraph B limits the power to branch in a municipality where a bank already "has" a branch, the context makes it reasonable to infer that "has" should be read as "has established and maintains" a branch. R.S. 17:9A–21, N.J.S.A. speaks of the Commissioner's approval as "the right * * * to open the branch office" which is automatically terminated in six months on the failure "to open and operate" the proposed branch within that time, unless the Commissioner, for good cause, grants extensions, as he did in this case to Suburban. The holding of the mere right to open a branch, which is automatically forfeited for failure to open and operate, cannot be said to constitute "having" a branch. Since this section of Article 6 of the statute expressly uses the language "right to open" to describe the Commissioner's approval, the failure to use that language in R.S. 17:9A–19, subd. B, N.J.S.A. in addition to the phrase "has a branch" must be taken to mean that such language does not refer to the mere holding of an approval to open a branch, especially when used in a context which strongly suggests it intends to incorporate by implication the words "established and maintained".

Finally, the obvious purpose of Article 6 strongly supports the foregoing constructions. R.S. 17:9A–20, N.J.S.A. directs the Commissioner to approve the application for a new branch if he finds, *inter alia*, that "the interests of the public will be served to advantage by the establishment of such branch office * * *." If, as Suburban and the Commissioner contend, the effect of the mere *approval* of the application by the Commissioner is to be construed as an exclusion from the Borough of a branch of any other banking institution, the public interest would be adversely affected by successive timely extensions of the authority to commence actual operation, which could deprive the residents of the Borough of any banking facilities indefinitely and thereby defeat the statutory purpose of assuring that the public need for banking facilities will be satisfied and as soon as possible after the finding by the Commissioner that that need exists. For example, in the present case, Suburban did not open its branch until over one and one-half years after the Commissioner issued his approval, while National opened its branch one day after the Comptroller issued his approval.

The foregoing analysis of the language of the New Jersey banking statute applicable to both Suburban and National leads to the conclusion that when R.S. 17:9A–19, subd. B(3), N.J.S.A. permits a bank to establish a branch in a municipality where no other bank "has * * * a branch office," the quoted phrase should be read as if the statute said "has * * * established and is maintaining and operating a branch office."

In October of 1962, when the Comptroller issued his approval to National to open a new branch, Suburban held only the Commissioner's approval to open a branch, and a contract to buy the real property for the site of the branch men-

tioned in that approval. Suburban did not *have* a branch office in Mountainside when it received the certificate of the Commissioner's conditional approval of its application *to* establish a branch there on U. S. Highway Route 22. When such certificate was received, Suburban had neither ownership nor right to possession of any lands at the location specified in the certificate. Moreover, it was precluded from establishing a branch at that location by existing zoning restrictions which it never succeeded in overcoming. By its very terms, the Commissioner's certificate could become effective only provided no such restrictions existed or such restrictions, if they did exist, were eliminated.

When National obtained authorization from the Comptroller on October 15, 1962 to establish and maintain a branch office in Mountainside, no other banking institution *had* a branch office in that municipality. When National actually opened its branch for business, on October 16, 1962, Suburban had no branch in the same municipality. Indeed, the location therein at which Suburban was unsuccessfully attempting to establish and maintain a branch in the Borough was later abandoned for that purpose by Suburban, and the approval of the Commissioner, which Suburban had secured for a branch in Mountainside was, through supplemental application, transferred to a different location therein, *after* National's branch had commenced its operations.

Finally, when National opened its branch for business on October 16, 1962, it then "had" a branch office in Mountainside within the meaning of R.S. 17:9A–19, subd. B(3), N.J.S.A., and thereafter, so long as that branch was open and operating there, neither Suburban nor any other banking institution, state or federal, could open a branch in that municipality.

In the light of the foregoing, we do not reach the question presented by National's contention that Suburban's application to the Commissioner for leave to change the location of its proposed branch in Mountainside amounted to a forfeiture or abandonment of the authority granted, although conditionally, by the Commissioner.

The material facts in these cases are uncontested. The pending motions require the Court to apply the language of the two governing statutes to the conceded facts. Such application compels the conclusion that the motion of Suburban and that of the Commissioner for summary judgment be denied, and that National Bank of Westfield is entitled to summary judgment, as a matter of law, on the demands in its counterclaim that Suburban be permanently enjoined from operating a branch in Mountainside and the operation by Suburban of a branch there be declared illegal and invalid. An order may be presented in accordance with the views herein expressed.