111 N.J. Super. 154 (1970)
268 A.2d 21
IN THE MATTER OF THE APPLICATION OF THE SUMMIT AND ELIZABETH TRUST COMPANY FOR A BRANCH BANK TO BE LOCATED AT THE INTERSECTION OF MOUNTAIN AVENUE AND THE RAHWAY VALLEY RAILROAD, SPRINGFIELD TOWNSHIP, UNION COUNTY, NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued June 15, 1970.
Decided July 14, 1970.
*157 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Stuart L. Pachman and Mr. Jerome C. Eisenberg argued the cause for appellant Springfield State Bank (Messrs. Clapp & Eisenberg, attorneys).
Messrs. Wilentz, Goldman & Spitzer, attorneys for appellant The National State Bank did not argue but filed a brief (Mr. Barry D. Maurer, of counsel).
Mr. Hugo M. Pfaltz, Jr. argued the cause for respondent Summit and Elizabeth Trust Company (Messrs. Bourne and Noll, attorneys).
Mr. George F. Kugler, Jr., Attorney General, attorney for the Commissioner of Banking and Insurance of New Jersey, did not argue but filed a statement in lieu of brief (Mr. T. Robert Zochowski, Deputy Attorney General, of counsel).
*158 The opinion of the court was delivered by LEWIS, J.A.D.
Springfield State Bank (Springfield) appeals from an order of the Commissioner of Banking and Insurance (Commissioner) approving the application of the Summit and Elizabeth Trust Company (Summit) for a branch office in the Township of Springfield (township).
Springfield contends in substance that (1) Summit is prohibited from establishing a branch bank in the township by virtue of the grant of "home office protection" by N.J.S.A. 17:9A-19(B) (3); (2) in any event Springfield, as a newly chartered bank in the township, is entitled to that protection because it would have been the first of the two to open for business "but for the entanglements of the legal processes"; (3) Commissioner Horace J. Bryant, Jr., about to be replaced by Commissioner Robert L. Clifford on the Governor's inauguration day (January 20, 1970), was without authority to grant the Summit application, and (4) the Commissioner's decision is not supported by the evidence, he abused his administrative discretion and failed to exercise his presumed expertise.
The National State Bank (National State), also an objector to the Summit application, appeals from the same order of the Commissioner, advancing in essence point (4) raised by Springfield. These appeals were consolidated for our review.
This protracted controversy focuses upon the Branch Banking Act, L. 1968, c. 415, § 1 et seq., which was adopted on January 17, 1969 to take effect on July 17, 1969. N.J.S.A. 17:9A-3.1 et seq. That statute divided the State into three banking districts and authorized branch banking within those districts subject to certain requirements. By its terms the act precluded the prospective granting of charters (after July 17, 1969) to "affiliate" or "chain" banks, theretofore permissible entities in the State, see, e.g., In re Kenilworth State Bank, 49 N.J. 330, 339-340 (1967), since N.J.S.A. 17:9A-3.1 provides, "No officer, director or employee of any bank may be, directly or indirectly, an incorporator of *159 another bank." It is clear, however, that the new enactment granted so-called "home office protection" to pre-existing affiliate banks. It declares in pertinent part that no bank may establish a branch, outside of the municipality in which it maintains its principal office, in any other municipality in which another banking institution "has its principal office." N.J.S.A. 17:9A-19(B) (3). The crux of the instant controversy is whether Springfield, within the intent and meaning of the act, has home office protection to the exclusion of a Summit branch office.

SPRINGFIELD'S POSITION
In December 1967 Springfield (an affiliate bank with interlocking directors in common with The First State Bank of Union) applied to the Commissioner for charter approval of a home office bank in the township. Statutory hearings were held on February 1, May 2 and July 23, 1968. National State was the only objector that participated in the proceedings. The Commissioner was aware of the imminence of probable adoption of a Branch Banking Act, which was a foreshadowed event, as indicated by letter from Summit to the Commissioner requesting that consideration of the Springfield application be deferred awaiting anticipated legislation amending the Banking Act. This request was rejected by the Commissioner, who expressed the view that a refusal to consider pending applications would be unfair.
On February 20, 1969 the Commissioner approved a charter grant to Springfield conditioned only upon the bank's engaging an acceptable executive officer prior to the issuance of a certificate of authority to commence business and that the bank become a member of the Federal Deposit Insurance Corporation. In reaching his decision the Commissioner found that the trade area was in excess of 24,000 and that the proposed bank office on heavily trafficked Route 22 would "serve the public interest" and afford "reasonable promise of successful operation."
*160 Summit, National State and Union Center National Bank (Union Center) appealed, and a stay of the operation of the Commissioner's decision was obtained from this court. Subsequently, National State and Union Center, both national banks, were granted branch bank approval by the Comptroller of Currency. Springfield then sought to vacate the stay, which was denied. Summit not only opposed the motion, but affirmatively and successfully moved for a continuance of the stay pending the appeal.
In short, Springfield was involuntarily and effectively precluded from completing the procedures which were necessary before obtaining a certificate of authority to conduct business. At this juncture we note that under N.J.S.A. 17:9A-17 a bank charter may be forfeited by the Commissioner upon failure to obtain a certificate of authority within six months from the date of the Commissioner's approval of its certificate of incorporation or upon failure to commence business within six months after the issuance of such certificate of authority. These periods are subject to extension by the Commissioner for periods not to exceed a total of 12 months.
Argument on those appeals was heard before this court on October 14, 1969 and, within a week thereafter, we affirmed the grant of the charter to Springfield, In re Springfield State Bank, 107 N.J. Super. 230 (App. Div. 1969), making this observation.
* * * the six-month delay in the effective date of the legislation could have had no other purpose than to permit the Commissioner to dispose of matters then pending, on the merits and in light of then existing law. (at 234)
The Supreme Court denied certification on January 13, 1970. In re Springfield State Bank, 55 N.J. 312 (1970). Accord, In re Peoples Bank of Montvale, 111 N.J. Super. 141 (App. Div. July 14, 1970).

SUMMIT'S POSITION
On May 5, 1969, after the adoption of the Branch Banking Act and while the charter grant to Springfield was under *161 appellate review, Summit formally applied to the Commissioner for the approval of a branch bank in the township. Hearings on its application were conducted on November 14 and December 4, 1969, during which objections were made by Springfield, National State and Union Center. The hearing examiner's report was filed January 8, 1970. He recommended approval of the application, for in his view the requirements of N.J.S.A. 17:9A-20(2) and (3) were met, i.e., the interest of the public would be served to advantage, and the local conditions afforded reasonable promise of successful operation. Ten days were allowed to the objectors to file exceptions. Springfield and National State filed written objections with the Commissioner on January 19, 1970; Union Center mailed objections on that date, but they were not received within the specified time.
On the morning of January 20, 1970, inauguration day, Commissioner Bryant, whose term of office was about to expire, was reluctant to act on the Summit matter. Counsel for Summit personally visited and requested Commissioner-designate Clifford to advise Bryant that he had no objection to his acting on the application on his last day in office. This Clifford did by telephone, and Bryant thereupon signed an order in Summit's favor. The operative effect of this aggregation of maneuvering was that both the principal office of Springfield and a branch of Summit were approved by the Commissioner. Springfield pursued the instant appeal on January 20.

THE COMMISSIONER'S ACTION
Preliminarily, we dispose of the argument that Commissioner Bryant was without authority to act on January 20. The Commissioner is required to serve "at the pleasure of the Governor during the Governor's term of office and until the appointment and qualification of the commissioner's successor." N.J.S.A. 17:1-2. Since Commissioner Clifford took the oath of office on January 21 and then again on *162 January 22, it is manifest that Commissioner Bryant had authority to act on January 20. Cf. Skladzien v. Board of Education of Bayonne, 12 N.J. Misc. 602, 605, 173 A. 600, 602 (Sup. Ct. 1934), aff'd o.b. 115 N.J.L. 203 (E. & A. 1935).
The decision of the outgoing Commissioner was brief; he stated that he had reviewed the entire record, adopted the report and recommendations of the hearing examiner and approved the Summit application.
Although the hearing officer found from the testimony and exhibits that Summit's proofs sufficiently complied with N.J.S.A. 17:9A-20, he demonstrated only casual concern with respect to the application of the provisions of the recent Branch Banking Act, in particular N.J.S.A. 17:9A-19 (B) (3), other than to recognize that that section prohibits the establishment of a branch office in a municipality wherein a "banking institution has its principal office." He concluded:
* * * Whether home-office protection attaches upon charter approval or upon the actual opening for business of a bank is a legal question difficult to answer and of potentially far-reaching consequences. The Department's position is in accord with Suburban Trust Company v. The National Bank of Westfield, 222 F. Supp. 269 (D.N.J. 1963). Thus, the approval of the charter of the Springfield State Bank did not and does not bar this application. * * *
It is axiomatic that due regard must be given to the expertise of the administrative agency regarding the economic feasibility of a proposed bank. In re Kenilworth State Bank, supra, 49 N.J., at 334; In re State Bank of Plainfield, 61 N.J. Super. 150, 158 (App. Div. 1960). In general, the Commissioner's determination should not be upset in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated a legislative policy expressed or implied in the governing statute. In re Howard Savings Institution of Newark, 32 N.J. 29, 52 (1960); cf. Campbell v. Dept. of Civil Service, 39 N.J. 556, 562 (1963); Gloucester County *163 v. Public Employment Relations Comm., 107 N.J. Super. 150, 156 (App. Div 1969), aff'd 55 N.J. 333 (1970).
Our prime concern is with the latter criterion. The gist of Springfield's argument is that "home office protection" as contemplated by N.J.S.A. 17:9A-19(B) (3) attached upon the filing of its certificate of incorporation with the Commissioner in December 1967, or, in the alternative, on February 20, 1969, the date the Commissioner approved its charter. Hence, it is contended that the subsequent approval, on January 20, 1970, of Summit's application for a branch bank in the same municipality contravenes the intent of the Legislature. Summit, on the other hand, asserts that no legislative policy was violated by the Commissioner. It maintains that the statutory grant of "home office protection" only arises when a bank has a functioning office  which Springfield did not have on January 20.

THE HOME OFFICE PROTECTION ISSUE
Stated simply, we are confronted with the question of when home office protection becomes effective, i.e., at the time of the banks' incorporation, the day of its charter approval, when it obtains a certificate of authority to do business, or when it actually becomes an operating bank.
The Commissioner, as previously noted, relied upon Suburban Trust Company v. National Bank of Westfield, supra. We find that case plainly distinguishable. There, the litigation was between a state-chartered bank and a federally-chartered bank to ascertain which of them was entitled to maintain a branch in the Borough of Mountainside. National Bank of Westfield applied to the Comptroller of Currency for branch office approval and, while its application was pending, Suburban Trust Company sought branch approval from the State Commissioner of Banking and Insurance. Pursuant to the then applicable N.J.S.A. 17:9A-19, only one of the proposed branch banks could be permitted to locate in that municipality. Suburban, on October 3, 1961, *164 obtained from the Commissioner a certificate of authority to do business, which, because of zoning problems was extended. Meanwhile, the national bank obtained its certificate of authority from the Comptroller on October 15, 1962 and opened a branch office the following day. The federal court held that the National Bank of Westfield was entitled to the branch location. Judge Wortendyke, in speaking for the court, declared:
* * * that a bank "has" a branch in a municipality, for the purpose of determining the right of another bank to open a branch there, only when it has a branch in operation and not when it merely has the approval of the appropriate governmental authority to open a branch. [222 F. Supp., at 275]
In that case "home office protection" was not an issue, but rather "branch protection."
As stated in In re Kenilworth State Bank, supra, 49 N.J. at 336, a branch bank is not a separate corporation or legal entity but "is an office or agency operated by the legal entity which operates the main bank. It has no separate board of directors or capital structure, its deposits are pooled with those of the main bank, and its loan limits are based on the main bank's capital structure." There is also a significant procedural distinction between a charter application and a branch office application. The agency inquiry as to the latter is less stringent and, indeed, a formal hearing is not a prerequisite. See First Nat. Bank of Whippany v. Trust Co. of Morris County, 76 N.J. Super. 1, 7-8 (App. Div. 1962). The Commissioner may act upon plenary and completely informative data supplied to him by the applicant and any objecting banks. Id. at 10. The crucial findings to be made are whether the interests of the public will be served and whether conditions in that locality afford reasonable promise of successful operation. N.J.S.A. 17:9A-20.
In contrast, the issuance of a bank charter must be preceded by application, hearing, notice, publication and findings, as set forth in N.J.S.A. 17:9A-9, 10, 11. In *165 addition to requisite findings as to public interest and probable success, there must be adequate findings as to such elements as capital structure, stock subscriptions, name, location, deposit liabilities, directorship and management. See In re Kenilworth State Bank, supra, 49 N.J. at 336-337; Camden Trust Company v. Gidney, 112 U.S. App. D.C. 197, 301 F.2d 521, 524 (1962), cert. den. 369 U.S. 886, 82 S.Ct. 1158, 8 L.Ed.2d 287 (1962).
Significantly, in the Suburban Trust Company case the two branch bank approvals were not obtained from the same licensing authority but, rather, from respective agencies representing the federal and state governments. Compare Suburban with National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6 Cir.1958), cert. den. 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958)[1]; Bank of Sussex County v. Saxon, 251 F. Supp. 132 (D.N.J. 1966).[2]
*166 Moreover, in the construction and application of our statutes we are not bound by a decision of the federal district court. Cf. State v. Broxton, 49 N.J. 373, 387 (1967); State v. Coleman, 46 N.J. 16, 36 (1965), cert. denied 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966).
Our statutory scheme recognizes the provisional existence of a bank, as a corporate entity, upon filing a certificate of incorporation; it is at once subject to the provisions of the Banking Act. N.J.S.A. 17:9A-12 and 13. Springfield's certificate states that its principal office "is to be located at 220-230 Route 22 Westbound, also described as follows: Being Lot 6, Block 144 and Lot 9, Block 144 on Tax Map of the Township of Springfield." The mere filing of the certificate, however, would not afford "home office protection" since no officially acknowledgeable status is attained until the required subsequent statutory proceedings have ripened into the actual granting of a charter.
The Commissioner, who issued a charter to Springfield shortly after the adoption of the 1969 Branch Banking Act, is chargeable with knowledge of the legislative policies therein expressed regarding "home office protection" and the specified statutory time periods within which a charter recipient must obtain a certificate of authority and commence operating as a functioning institution. In light of such circumstances, and the appeals and stays initiated or participated in by Summit, there appears to be nothing in the record, factual or legal, to justify the Commissioner's interim consideration of Summit's application, filed May 5, 1969, the approval of which might have the effect of undercutting or circumventing protected rights under a charter he previously granted. There was no apparent public need for accelerated action.[3] While absolute public necessity for *167 further banking facilities is not essential, see In re Howard Savings Institution of Newark, 32 N.J. 29, 49 (1960), the Commissioner should always be mindful of the fact that banking is a business peculiarly affected with a vital public interest. To that end, the granting of bank privileges should be tempered with the realization that neither under-banking nor over-banking will serve the public interest, and that in some circumstances discretionary restraint might well dictate adherence to an observance in Ecclesiastes 9:11 that "the race is not to the swift, nor the battle to the strong."
Springfield was not free to proceed with the obtaining of a certificate of authority, for which purpose, under N.J.S.A. 17:9A-17, it would have six months, until the appeal and stay processes involving its charter approval had been terminated in its favor. The argument runs, and there is nothing in the record to suggest a contrary conclusion, that but for "the entanglements of the legal process" it was in a position to qualify for the necessary certificate of authority and to actually open its bank by July 1969. It was while Springfield was under legal restraints that Summit applied for branch approval, which the Commissioner granted within seven days after the Supreme Court denied certification in the Springfield case, supra (55 N.J. 312 (1970)), giving finality to the Springfield charter approval.
Admittedly, the corporate existence of Springfield was a defeasible one, since the Commissioner could, in appropriate circumstances, refuse to issue a certificate of authority or could cancel charter approval. N.J.S.A. 17:9A-14, 17:9A-17. Until such official revocation or disapproval occurs, "home office protection" should attach to the charter grant. Compare In re State Bank of Plainfield, supra, 61 N.J. Super. at 160. And see First National Bank *168 in Billings v. First Bank Stock Corp., 306 F.2d 937, 940 (9 Cir.1962), where the court, contrary to the rationale of Suburban, supra, held that, notwithstanding a 4 1/2-year delay from the time of charter approval until bank opening, the bank's rights were established and flowed from the date of its charter authorization.
In the factual complex of this case, it would be inequitable to deny to Springfield the benefits of the Branch Banking Act while it was subject to the statutory concomitant burdens and could not obtain a certificate of authority and open for business because of the stays obtained by the objectors of its charter. See Burke v. Hoffman, 28 N.J. 467, 474-475 (1958). "Priority in time gives the better equity." 2 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 414, at 162.
We have considered Summit's numerous contentions addressed to the intent of the Legislature and find them interestingly argumentative, but unpersuasive. To adopt the interpretation it ascribed to our statutes would permit the undermining of the legislative grant of "home office protection" by evasion and legal maneuvering. This should not be judicially condoned.
It is fundamental that statutory constructions "calling for unreasonable results will be avoided where reasonable results consistent with the indicated purpose of the act as a whole are equally possible." Elizabeth Federal Savings & Loan Ass'n v. Howell, 24 N.J. 488, 508 (1957); see State v. Provenzano, 34 N.J. 318, 322 (1961); In re Princeton Bank and Trust Co., 87 N.J. Super. 247, 261-262 (App. Div.), certif. den. First National Bank of Princeton v. Princeton Bank and Trust Company, 45 N.J. 32 (1965); 2 Sutherland, Statutory Construction (3d ed. 1943), § 4704, at 338. As stated in Schierstead v. Brigantine, 29 N.J. 220, 230 (1959), "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as `consonant to reason and good discretion.'"
We hold under the circumstances of this case, particularly where the same administrative agency is involved *169 in granting both applications, that Springfield acquired "home office protection" within the meaning of the 1969 Branch Banking Act, and that such protection prevailed throughout the proceedings that culminated in the Summit branch office approval. This determination is predicated on the inveterate principle that statutes must be construed so that their meaning will "justly turn on the breadth of the objectives of the legislation and the common-sense of the situation." Jersey City Chapter Property Owner's Protective Ass'n v. Jersey City Council, 55 N.J. 86, 100 (1969).
We note parenthetically that the interpretation here expressed was earlier espoused by Summit in its brief filed in connection with its appeal in opposition to the charter grant to Springfield. There, arguing unsuccessfully that the better interests of the municipality would best be served by permitting more branch offices, Summit urged that "by granting this charter [to Springfield], the Commissioner in effect created home office protection in Springfield, New Jersey and thereby foreclosed that municipality from consideration for additional branch offices."
The Commissioner's decision and order presently under review is in conflict with the intendment of our statutes and, accordingly, the order should not stand.
Having thus concluded, we find it unnecessary to reach the remaining issues raised by appellants; we pass them, but in so doing observe that they are not entirely without substance.
Reversed.
NOTES
[1] In this case authority to open a branch bank in the City of Troy, Michigan, was granted by the state banking commissioner to Wayne Oakland Bank. Subsequently, The National Bank of Detroit applied to the Comptroller of Currency for permission to open a branch bank in that municipality. Michigan law prohibited a branch in the municipality in which another branch had already been established. The officers and attorneys for the Detroit bank prevailed upon the Comptroller not to inform the state commissioner of their pending application, fearing the state bank would immediately open its branch once such intelligence was gained. The state bank did open its branch, albeit, after the Comptroller had authorized (but not certified) the national bank to open its branch. Implicit in this decision by the Sixth Circuit is a "dim view" of the subterfuge resorted to by the national bank and the Comptroller in an attempt to have the national bank win the race for the establishment of a branch in Troy.
[2] The court held that a state bank had standing to seek a trial de novo of the propriety of the action taken by the Comptroller of Currency in issuing a certificate to authorize a national bank to open a branch in the township. The certificate was granted while the state bank was in the process of complying with the state commissioner's requirements for approval of a branch in the township under state statute permitting only one branch bank in the municipality. A plenary trial was granted for determination of the ultimate question of whether, in light of all the facts found, the Comptroller's action was warranted because the state bank had a right to insist that no branch be established through procedures or upon grounds not acceptable under the statutory scheme. (At 143)
[3] Springfield Township is 5.20 square miles in area. According to the New Jersey Department of Conservation and Economic Development, the population of the township was 16,430 in 1968, with limited growth expected in the next few years. As noted in an economic feasibility study on Springfield, prepared in support of its charter application and before the hearing examiner in the instant case, there are 57 banking offices within a five-mile radius of Springfield's location. In November 1969, when the first hearing was held on Summit's application, there were three branch banks and two savings and loan institutions in the township, together with the newly chartered home office bank of Springfield which had not yet opened.